MARGARET PATTERSON v. WORKINGMEN'S BUILDING
AND LOAN ASSOCIATION.

BUILDING AND LOAN ASSOCIATION. *Contract. Not usurious. When.* A contract between a Building Association, organized under the act of 1875, chapter 142, sections 5 and 14 (new Code, section 1742, *et seq.*), and one of its members, by which the Association advances money to the member upon the anticipated value of his stock when the accumulations shall bring all the stock to par, upon a premium bid by the member in open competition for the fund, and the member agrees to continue to pay his monthly dues on the stock, and to pay in addition monthly installments on the whole amount bid for, equivalent to interest at the rate of six per cent. per annum until the assets of the Association reach the par value of the stock, and secures his compliance with these terms by a note for the amount bid off and a deed of trust on realty, is not usurious.

FROM SHELBY.

Appeal from the Chancery Court at Memphis. W. W. McDowell, Ch.

TAYLOR & CARROLL, POSTON & POSTON and T. B. EDGINGTON for complainant.

FINLAY & PETERS, J. W. HAMPTON, T. B. TURLEY, CARUTHERS & MALLORY, WRIGHT & FOLKES, CLAPP & BEARD, M. B. TREZEVANT and R. D. JORDAN for defendants.

COOPER, J., delivered the opinion of the court.

Bill to be relieved from alleged usury in a transaction between the Workingmen's Building and Loan Association and one of its corporators. The chancellor granted the relief sought, and the Association appealed.

The Association was organized under the act of the Legislature of 1875, chapter 142, sections 5 and 14 (new Code, section 1742, *et seq*). This act, after conferring the general powers conceded to all corporations created for profit, proceeds to grant certain special powers to Building Associations. "The funds of said corporation," it is enacted, "may be loaned out to the stockholders in such manner, on such terms and conditions, and under such regulations as the said corporation, by its constitution and by-laws, may prescribe, *provided* the same be secured by real estate; and any funds of the said corporation, which may remain after the stockholders have borrowed all they desire, may be loaned out to other persons, the same being secured by a lien on real estate. The members of said corporation shall have the power to adopt a constitution, and the constitution, the by-laws and regulations shall have the force and effect of a. legal enactment on the members of said corporation, *provided* the same are not in conflict with the general law of the land. * * The by-laws may prescribe the amount of shares and the time of payment thereof by instalments, but the monthly call for the payment of said instalments shall not exceed two dollars on each and every share. Every share of stock shall be liable for, and subject to a lien for the satisfaction of any unpaid instalments, and the by-laws may provide the mode and manner of enforcing said lien. New shares may be issued in lieu of any shares withdrawn or forfeited. The shares may be issued in one or successive series, in such amounts as the board of directors may determine, and

any stockholder wishing to withdraw, as he or she may have the right, shall give thirty days' notice thereof, when said withdrawing stockholder shall be entitled to receive the amount paid in, and such proportion of the profits as may have been accumulated; *Provided,* that at no time shall more than one-half the funds in the treasury be subject to the demands of withdrawing stockholders without the consent of the board of directors, nor shall any stockholder be entitled to withdraw whose shares are pledged to the corporation. The personal representative, upon the death of a stockholder, shall be entitled to receive the full amount paid in by the deceased and any profits which have been realized, *provided,* that if said stock is pledged to the company, the same shall be redeemed by said personal representative. The board of directors shall hold stated meetings at which the money in the treasury, if over two hundred dollars, shall be offered for loan in open meeting at a rate not in conflict with the laws of the State, and the stockholder who shall bid the highest premium for the preference or priority, shall be entitled to receive a loan of two hundred dollars for each share held by such stockholder. * * In case of non-payment of instalments or interest by borrowing members for the period of six months, payment of principal and interest, without deducting the premiums paid or interest thereon, may be enforced by proceeding on their securities according to the terms of the contract under which the same were pledged. The premiums bid by borrowing stockholders for the preference or priority of

loan shall be paid before the loan is consummated, not as part of the loan, not as interest, but as a means of determining which one of the stockholders shall receive the loan, whenever there are a number of stockholders who may simultaneously desire to effect a loan. * * Said corporation may determine, by an express provision of by-laws, that when each share of stock reaches a certain value, to be specified thereby, not exceeding two hundred dollars, the stockholders shall be paid such value for each share they respectively own, and that upon such payment the stock shall revert to the corporation."

The following provisions of the constitution of the Association are quoted as bearing upon the matters of controversy. The object of the incorporation is stated to be "the accumulation of a fund which may be loaned on good security to the members thereof to aid them in procuring homes, and such other investments as are provided in the constitution. The stock of the Association is to be issued in successive series of two hundred dollars per share. The members shall be white residents of the United States, who shall have subscribed for one or more shares of stock and signed the constitution. No one person shall hold more than fifty shares of stock. * * Any member wishing to withdraw one or more shares of his or her stock, which is not pledged to the Association, shall give thirty days' notice in writing, at the expiration of which time the withdrawing stockholder shall be entitled to receive the amount actually paid in on such stock and such proportion of profits that may have

accrued as the board of directors may determine to be just and equitable, deducting from the amount all dues, fines and penalties that are charged against the withdrawing stockholder. * * All stock upon which dues, fines, penalties or interest are unpaid, is hereby declared to be pledged to the Association to secure the payment of the same. * * In case of non-payment of instalments or interest by borrowing members for the period of six months, it shall be the duty of the board of directors to enforce the terms of the deeds of trust held as security in accordance with the provisions of the act. of the Legislature of 1875. * * On each share of stock there shall be paid an instalment of $1 per month in advance, and any person wishing to subscribe for stock subsequent to the issue of a series shall pay up instalments which have become due in the series in which said stock may be taken or issued, and such premiums as the board of directors may require. * * At the stated monthly meetings of the directors, the funds on hand not otherwise appropriated, shall be offered for loan. Every member shall be entitled to a loan not exceeding the par value of any number of shares held by him or her; *provided, however,* that no member shall be entitled to a loan on more than fifteen shares at one bidding. Choice of priority of loan shall be by bid of premium, and the member bidding the highest premium for priority or privilege shall have the first choice of loan, when the remaining funds, if any, shall be loaned in like manner. Interest on all loans shall be at the legal rate of interest from the time of mak-

ing said loans, and shall be paid in monthly instalments in advance, and at the same time that the regular dues are paid; and such loans shall be for the purpose of enabling the borrower thereof to secure a home, or for the purchase of other real estate, or for the improvement of the same, and for no other purpose whatever, and the loan shall be secured by deed of trust on unencumbered real estate. * * All claims for dues, interest, fines, expenses and penalties shall be held as a lien against the stock of delinquent members, and when there are six months' dues remaining unpaid the stock shall be declared forfeited, and revert to the Association; *provided,* the holder of said stock shall be entitled to receive the same amount that would be paid to stock withdrawn at the time payments ceased to be made, less all claims held by the Association against said stock. * * When the stock of the oldest series shall reach its ultimate or par value, and all losses and gains adjusted thereto, there shall be paid to each member holding unpledged shares the sum of two hundred dollars per share; and all securities held in trust or stock pledged for loans shall be quit-claimed and satisfied, and the said shares revert to the Association; *provided,* that all claims of whatever kind against the stock or securities of any member must be fully paid up before such stock shall be redeemed or securities cancelled. If, after the liquidation as thus provided, there shall be a surplus still remaining, the same shall be divided *pro rata* to their respective interests among all the members of such series."

The complainant, according to the agreed statement of facts, is the only child and heir of Julia S. Chester, deceased, and as such the owner of eight shares of stock in the defendant Association, originally taken or subscribed by her mother, and of the land conveyed in trust to secure to the Association certain dues and liabilities therein mentioned. On February 5, 1878, when $1,200, money then on hand belonging to the Association, was offered for loan in open meeting, a number of members being then present and competing, Julia S. Chester became the successful bidder by bidding for the preference or priority of loan $66 premium on each of six of her shares of stock, or thirty-three per cent. on the amount offered, aggregating $396. The premium was deducted from the $1,200, and the residue of the money paid to her, she executing a note at one day for $1,200, and making a trust conveyance of realty to secure the Association as hereinafter mentioned. On April 2, 1878, Julia S. Chester in like manner became the successful bidder for $400, at a premium of $68 on each of her two remaining shares, and executed her note for $400, and making another trust conveyance of the same realty for the security of the Association. The first loan was applied for to pay off tax and other encumbrances on the realty, and refit the premises, and the second loan to build a tenement house. The premiums so bid were among the highest premiums ever bid by a member of the Association, the premiums varying from time to time, the lowest being $25 a share. The biddings were opened and

conducted by the Association under and in pursuance of the charter, constitution and by laws of the corporation. Julia S. Chester paid on her shares the monthly dues, and one dollar per month on each share as interest on her notes, until she had paid the amount specified in the agreement. It is also agreed, "that it is the theory that under the methods adopted by the Association in the loaning of its money and effecting the object of its organization, it will work out for its members the full payment of their stock within a period of ten years, and that the borrowing stockholder pays off his entire indebtedness within the same period, and that a large number in the Association have so worked out the payment of said loan and stocks."

The note given on the first loan is in these words: "One day after date, I promise to pay to the Workingmen's Building and Loan Association of Memphis, Tennessee, twelve hundred dollars for value received, with interest from date at the rate of six per cent. per annum, payable monthly in advance. This note is secured by a trust deed on house and lot particularly described in said trust deed, which is of record in the register's office of Shelby county, Tennessee. Memphis, February 5, 1878." The condition of the deed of trust is as follows: "Whereas, the said Julia S. Chester has become indebted to the Workingmen's Building and Loan Association in the sum of twelve hundred dollars, as is evidenced by my promissory note, signed by me, for said sum, and due one day after date, with interest from date at the

rate of six per cent. per annum, and the said Julia
S. Chester is desirous to secure and make certain the
payment of the said note according to the tenor
thereof, and the stipulations and conditions hereinafter
set forth. Now, then, if the said Julia S. Chester
shall pay, or cause to be paid, the full amount of
interest on said note monthly in advance, as required
by the rules, regulations and by-laws of said Associa-
tion, and, in addition thereto, shall pay all assessments,
dues and fines that may be assessed or imposed upon
me by virtue of my ownership of stock as aforesaid,
regularly and promptly, as required by the rules, reg-
ulations, by-laws and constitution of said Association,
until the assets of said Association shall reach the
par value of all shares of stock taken and subscribed
for, or until she ceases to be a stockholder of said
Association, and shall in all other respects fully comply
with the rules, regulations, by-laws and constitution of
said Association, then and in that event, this deed to
be void and of no effect." Then, after certain stip-
ulations in regard to keeping the premises insured,
the deed authorizes the trustee, upon the failure of
the grantor to comply with its terms for six months,
to sell the land at public sale for cash, and appro-
priate the proceeds thus: "First, to the payment of
the necessary expenses and costs of said sale; second,
to the satisfaction of said debt of twelve hundred dol-
lars, with all the interest and accumulated expenses
as hereinbefore set forth, whatever these may be, and
the balance, if any there be, to me or my legal
representatives."

Building Associations were first sustained by the courts in England as private, individual enterprises, and were afterwards sanctioned by act of Parliament. They exist in Great Britain and most of her colonies, have spread over the continent of Europe, and have found favor with the legislatures and the people of most of the States of this Union. There must be something in them which meets a popular want, and commends them to the law-making power. That something is not hard to find. The idea which first gave rise to their institution, which furnishes their ostensible and legitimate *raison d'etre,* and which secured to them their popularity and their, in many respects, exceptionally favored existence before the law, is that of enabling persons belonging to a class whose earnings are small, and with whom the slowness of accumulation discourages the effort to become, by a process of gradual saving, either at the end of a certain period or by anticipation of it, the owners of homesteads: Endlich on Build. Ass., sec. 7. They are another form of the savings bank system, with, as experience has shown, even more safety against loss, and with the advantage of allowing the member to anticipate the eventual profit. They have labored under the disadvantage of having no well-defined nomenclature applicable to their modes and operations exclusively. Facts, says M. DeTocqueville, occur faster than words are invented to define them. The Associations were compelled to use words already having a well-defined meaning in a different sense. For the dividends expected to be made when the Association was closed, and the subscription for those dividends,

they adopted the words stocks and shares.  For the advance upon the dividends by way of anticipation, and the amount which the member was willing to give out of the final dividend for the preference of an advance the words "loan" and "premium" or "*bonus*" were used.  The difficulty of the courts has often been to get below these words to the real thing, and not to be led astray by them.  The law-maker has been compelled to adopt the same nomenclature used by the Associations in drawing up their own constitutions and by-laws.  In one of the early English cases Lord Chancellor Truro had occasion to note the fact in his efforts to properly construe the act of Parliament under which the litigant Association was organized, the constitution and by-laws of the Association drawn up under the act, and the mortgage taken in the course of the operations of the company.  "Unfortunately," he says, "each of them is very inaccurately framed, with little attention to the consistency of language in the different parts of them, not always using the same words in the same sense, nor considering the applicability and correctness of the expressions in reference to the subject-matter to which they refer": *Seagrave* v. *Pope*, 1 DeG., M. & G., 783. The remark, "unfortunately," is still applicable to more recent legislation, and rules, regulations and instruments drafted thereunder, and, as we shall see, is not altogether amiss to the case before us.  Over thirty years ago special charters were granted in this State to building associations, all drawn on the same model. These charters were held not to justify the constitu-

tion and by-laws which the associations felt authorized. to adopt under them: *Martin* v. *Nashville Building Association,* 2 Cold., 418. The general law of 1875, under which the existing associations are organized, does expressly authorize the acts which were held to be illegal in that case, and therefore gives rise to an entirely different question. The law has been in force for ten years, and the agreed facts in the case before us show that there are eleven associations organized under it in Memphis. · Our docket shows the existence of similar associations in this city, and we know as matter of current history that like associations have been formed, and are operating in many of the cities and towns in the. State. The interests involved in any decision we may make are very large, and it is our duty, in view of these facts, to give the whole subject a careful consideration.

The points made and argued on behalf of the complainant are:

First. That the loan of money to Julia S. Chester, the highest bidder, in pursuance of the charter and by-laws of the defendant company, was violative of the interest laws of the State, and the premium so˙ charged and received therefor, was invalid and unlawful, and as such cannot be collected from ˙ the complainant or her property.

Second. The charter of the defendant Association requiring that "the premium paid by borrowing stockholders for the preference or priority of loan shall be paid before the loan is consummated," makes the loan to Julia S. Chester, as a building association con-

tract void; for the loan was not made as prescribed by the charter, .the premium not having been paid before the loan was consummated, but deducted from the amount thereof. The law and the courts requiring in such cases a strict conformity with statutory requirements, the contract is not protected by the charter, but becomes one of simple borrowing.

Third. In no event can the Association claim interest on the premium charged, because, by the charter, the premium is not embraced in the loan, but paid before the loan is consummated.

All of these propositions turn upon the letter of the general act of incorporation, and depend for their cogency upon the conclusions we may come to upon the substance of the legislation. The first and third may be considered together, for they both present the issue of usury. The second point is not sustained by the facts, for the premium was paid or deducted before the loan was consummated, and, in that view, the proposition is resolved into the first and third, that is to say, did what was done, the retention of the premium, and receiving monthly payments on the whole sum bid off in the form of interest, make the transaction usurious? The sole issue in reality is usury or no usury.

And here it may be conceded at once that if the substance of the transaction be a mere loan of money for a bonus, the contract would be usurious. The State Constitution expressly provides: "The Legislature shall fix the rate of interest, and the rate so established shall be equal and uniform throughout the

.State": Const., Art. XI., sec. 7. And, consequently, the Legislature cannot grant to a corporation·or class of corpo- rations the right to charge a higher rate of interest than the rate fixed by the general law: *McKinney* v. *Hotel Co.,* 12 Heis., 104. It may also be conceded that if the facts made out the case of a fraudulent and corrupt device∘to avoid the statute of usury, under the pre- tense of legislative authority, the complainant would be entitled to relief. There are no such facts in this ·case, the particular transaction being in strict accord with the authority conferred by the charter. And the idea that the Legislature intended to create a corrupt device to avoid the usury laws cannot of course be entertained. The question is therefore narrowed down to the point whether what was done, under legislative authority, is nevertheless illegal because in violation of an express provision of the Constitution.

The Association, by its contract with its borrowing member, required security by note and trust deed for the payment of monthly dues, equivalent to interest at the rate of six per cent. per annum on the whole amount offered and bid off, until the accumulations of funds would bring all the shares up to par,' and the Association paid over to its member, by satisfying his indebtedness to that extent, the net sum left after de- ·ducting the *bonus* bid from the amount offered and bid. This contract is authorized by the act of the Legisla- ٬·ture, which, after directing the money in the treasury to be offered for loan to the stockholder who will bid the highest premium for the preference or priority, ٫proceeds thus: "In case of non-payment of instalments

or interest by borrowing members for the period of six months, payment of principal or interest, without deducting the premium paid or interest thereon, may be enforced by proceedings on their securities according to the terms of the contract under which the same were pledged. The premium bid by borrowing stock-holders for preference or priority of loan shall be paid before the loan is consummated, not as a part of the loan, not as interest, but as a means of determining which one of the shareholders shall receive the loan, whenever there are a number of stockholders who may simultaneously desire to effect a loan." The plain meaning is that the premium shall not be taken into the account in determining the instalments or interest to be paid on the amount bid off, but the payment of such instalments as interest may be enforced " by proceeding on their securities according to the terms of the contract under which the same were pledged." The terms of the contract are that the payments of instalments or interest shall continue until the stock of the particular series reaches its par value, when, as the constitution of the Association says, " all securities held in trust or stock pledged for loans shall be quit-claimed and satisfied." And the note and deed of trust of the borrowing member, which form parts of the same transaction, equally embody the contract by stipulating for the payment of interest on the note " as required by the rules, regulations and by-laws of said Association," " until the assets of said Association shall reach the par value of all shares of stock taken," or until the member " ceases to be a stockholder."

And the proceeds of a sale under the trust, if a sale be made, are to be applied to the satisfaction of the debt "as hereinbefore set forth." That is to say, to the satisfaction of the instalments or interest on the loan for the period of the estimated life of the Association. The constitution of the Association makes this plain by another provision as follows: "All claims for dues, interest, fines, expenses and penalties shall be held a lien against the stock of delinquent members, and when there are six months' dues remaining unpaid, the stock shall be declared forfeited and revert to the Association; *provided,* the holder of said stock shall be entitled to receive the same amount that would be paid to stock withdrawn at the time payments ceased to be made, less all claims held by the Association against said stock." The statute gives a withdrawing stockholder the amount he has paid into the Association, "and such proportion of the profits as may have been accumulated." The borrowing stockholder, therefore, whether he pays or defaults, gets the benefit of his payments on stock and loan, is never required to pay the principal of the loan, and only held liable for the instalments or interest on the loan during the life or estimated life of the Association. Is such a contract usurious?

In a contract of loaning of money between individuals, if the lender charge and receive a bonus for the loan of money to be repaid with interest, whereby the one would pay and the other receive more than the legal rate of interest for the use of the money, it would be usury. If we treat the advance by a Build-

Patterson v. Workingmen's Building and Loan Association.

ing Association to one of its members of the anticipated value of his stock as a loan, and the premium bid therefor as a bonus, and the instalments agreed to be paid on the advance as interest, the analogy between the two transactions is very striking, and a similar conclusion as to the character of the latter seems to follow of course. And the fact that the words loan, bonus and interest are used in describing the steps in, or the elements of, the contract tends to strengthen the analogy. It will aid us in distinguishing the two transactions if we consider the latter transaction as a contract between two persons working out a common object for the benefit of all the associates, and not in antagonism, and if we substitute for the ordinary terminology of a loan the proper words advance, premium and instalments. A Building Association, organized under an act of the Legislature, is created for the accumulation, from fixed periodical contributions of its shareholders or members and the profits of their investment, of a fund to be used in making advances to the members for the purpose of building houses and acquiring or securing homesteads, upon terms and under regulations sanctioned by experience and prescribed by the Legislature, upon principles of mutuality and equality of benefits and obligations, with the effect of gradually extinguishing the liability incurred for the advancements simultaneously with the prescribed continnance of the periodical contributions of the members; the periodical contributions being so calculated as to amount, in the aggregate at compound interest, to the value of all the shares as agreed upon at the forma-

tion of the society and fixed by the charter, within
the period allowed for the anticipated duration of the
Association, after deducting the necessary expenses of
the business: Endlich on Build. Ass., sec. 39. These
associations, like those for the insurance of property
and lives, are founded on mathematical calculations.
"Their fundamental idea," says the Supreme Court of
New Jersey, "is that one, who has the privilege of
paying money advanced to him in small sums monthly,
can, in consequence of the slight strain the payment
makes on his resources each month, pay a large per
cent. for the use of that money, and the whole scheme
is based upon fairness and equity to all parties":
*Franklin Building Association* v. *March*, 5 Dutch., 225.
The premium bid by a borrowing member, says Mr.
Endlich, is the conventional difference between the par
value of the share advanced, and the amount actually
received by the borrower. It is not, therefore, a cash
payment which he is obliged to make upon obtaining
his preference, nor can it properly be said to be a
deduction made at the time from any money belonging
to him. What the Association sells is the right of
anticipating the fixed value of the shares by receiving
what, in the borrower's opinion, may presently be equal
to that future dividend. The difference between these
two values, the premium, the member promises to make
up in raising his share, for the benefit of all the
members of the society, to its par value. When that
is accomplished, the society absorbs the whole, and then.
only is the premium paid: Endl. on Build. Ass., secs.
388, 390 *n*; *Watkins* v. *Workingmen's Building and
Loan Association*, 97 Pa. St., 514. The borrowing

member continues to be a member, and shares in its profits. The advantage of borrowing from the Association, outside of the facilities afforded for the gradual discharge of the indebtedness, constituting the consideration for the premium, arises largely from the uncertainty as to the precise amount the borrower will be obliged to lay out in the eventual return of the loan. If the society is successful, it may be, in the whole, a sum much inferior to the face of the obligation, and very slightly, if at all, in excess of the amount actually received with interest. The transaction of an advancement partakes both of the character of a loan and of dealing in partnership funds, either element giving its color to the transaction accordingly as the form, substance and results of the same are or are not within the intention and protection of legislative enactment: Endl. on Build. Ass., sec. 357.

In England the courts have held, both in the case of voluntary associations and of associations organized under act of Parliament, that the transaction of an advance of money to a member upon a premium bid is not a loan of money, but a dealing with the partnership or joint fund, and therefore not usurious: *Silver* v. *Barnes*, 8 Scott, 300; *Burbridge* v. *Cotton*, 8 Eng. L. & Eq., 57; *Seagrave* v. *Pope*, 1 DeG., M. & G., 783; *In re Building Society*, L. R., 12 Eq., 516. In *Seagrave* v. *Pope*, Lord Chancellor Truro, notwithstanding the language of the Society's rules, which, like our act of 1875 and the rules of the company before us, treated the advance as a loan, held, in an elaborate opinion, that the transaction was not a loan,

but an anticipatory payment, by way of discount, of the shares the members would otherwise be entitled to claim payment of at the termination of the Society. The English rule of decision has been followed in Massachusetts, New Jersey, and other States. And the Supreme Court of New Jersey held that the principle declared in relation to voluntary associations would equally apply to incorporated associations: *Clarksville Building Ass.* v. *Stephens*, 11 C. E. Green, 351. The relation of the members of both classes of Association, as between themselves, being the same, the purposes and mode of operation of both classes being similar, and the funds paid in for the benefit of all, it is difficult to see why the principle should not equally apply to both. The corporation and its officers, in the case of chartered associations, are only the means of doing the same thing and accomplishing the same ends which are done. and attained by the firm and its managers in the other case. Precisely the same working force is required in each.

If, however, the intervention of the corporate entity operates to take the case out of the general rule of the English cases, a large majority of the American courts have held the contract under consideration not usurious, partly upon the ground that it amounted to a purchase or redemption of the stock by the Association, and partly because of the uncertainty in the payments by which the principal of the advance, treated as a loan, is put at hazard: *Delano* v. *Wild*, 6 Allen, 1. "We take it," says the Supreme Court of the District of Columbia, in a recent case identical

in principle with the one before us, "that usury is involved only when there is an absolute undertaking binding the person to pay back the principal of the loan, and either by contract or some artifice to pay usurious interest. Here there is no undertaking at all to repay the principal of this loan. The undertaking is to pay two dollars a month on this stock, one dollar of which it is admitted is payable as dues, and the other as a contribution to the profits upon the stock. But the undertaking is not to continue for any specific length of time. Its performance may continue a longer or shorter period, and if all the borrowers, or parties upon whose stock money is advanced or loaned, keep their promises, the period is shortened, because just so much sooner does the time arrive when the profits on the stock amount to the stipulated sum. To the extent that the period is shortened by the performance of the contract, the amount to be paid is reduced, and the borrower receives in that way the benefit of his payments. There are two elements, therefore, for consideration. The borrower takes, in one case, a part of the benefit in the execution of the contract, not because the proceeds are distributed to him, but by shortening the period during which he shall pay. The other is, that the form of the contract does not oblige him to continue paying for any specific length of time, and does not amount in itself, therefore, to an undertaking to pay the advance. It may happen that he may be discharged from the obligation to continue these payments before he shall have paid back the principal and the

legal interest.  The probability may be the other way, but the undertaking does not make it so.  The result then is that the contract is not usurious": *Burns* v. *Metropolitan Building Association*, Nov. 10, 1884.

The transaction between the Association and one of its members upon an advance on stock is not in fact a loan of money, although so-called in the act of the Legislature, and in the constitution of the Association, and even in the instruments executed in completion of the contract.  It is in substance a sale by the member to the company of his expected dividend on his subscription at the winding up of the Association for a money advance, he agreeing to continue to pay his dues on the stock subscribed, and to pay, in addition, upon the par value of the stock monthly instalments, equivalent to six per cent. interest on that value, until the accumulations of the Association shall enable it to pay or settle all the stock of the same series at par.  There is no contract to pay the advance at all, which is essential to constitute usury in the loan of money: *Delano* v. *Wild*, 6 Allen, 1.  If a per centage per annum be adopted as an easy mode of adjusting profits upon a settlement between partners, or persons engaged in a joint venture, it will not be usury: *Gilliam* v. *Moore*, 8 Hum., 468.  The principal is put at hazard by being made to depend upon a contingent event, as in the case of bottomry and *respondentia*, or loans on *post obit* bonds, in which cases the stipulation for the payment of extra interest is not usury: 2 Pars. on Con., 415; *Thorndike* v. *Stone*, 11 Pick., 183; *Delano* v. *Wild*, 6 Allen, 1.

Patterson *v.* Workingmen's Building and Loan Association.

Our conclusion is that the contracts under consideration were authorized by the act of the Legislature under which the defendant Association was organized,. and are not usurious.

The chancellor's decree must be reversed, and the· Association may take a decree, under the agreement in the record, for the enforcement of the contracts· with the costs of the cause, upon the principles settled by this decision.

COOKE, J., delivered the following dissenting opinion:

The defendant, the ·Workingmen's Building and Loan Association, was incorporated June 10, 1875, under the provisions of the act of the General Assembly, passed March 19, 1875, ch. 142, secs. 5 and 14, entitled "An act to provide for the organization of corporations." Said fourteenth section providing for the incorporation of building associations, among other things, provides :· "that the funds of said corporation may be loaned out to the stockholders, in such manner, on such terms· and conditions, and under such regulations as the said corporation by its constitution and by-laws may prescribe; *provided*, the same be secured by real estate, and any funds of the said corporation which may ̀ remain after the stockholders have borrowed all they desire, may be loaned out to other persons, the same· being secured by a lien on real estate. , * * ̀The· board of directors shall hold stated meetings, at which the money in the treasury, if over two hundred dollars, shall be offered for loan in open meeting at a

rate not in conflict with the laws of the State, and the stockholder who shall bid the highest premium for the preference or priority shall be entitled to receive a loan of two hundred dollars for each share held by such stockholder; *provided,* that a stockholder may borrow such fractional part of two hundred dollars as the by-laws may provide, and good security shall be given by the borrower to secure the repayment of the loan. In case the borrower shall neglect to offer security, or shall offer security that is not approved, the proposed borrower thus failing to give security shall be charged with one month's interest, and the money resold at the next stated meeting. In case of non-payment of instalments or interest by borrowing members, for a period of six months, payment of principal and interest, without deducting the premiums paid, or interest thereon, may be enforced by proceeding on their securities according to the terms of the contract under which the same were pledged. The premium bid by borrowing stockholders for the preference or priority of loan shall be paid before the loan is consummated, not as part of the loan, not as interest, but as a means of determining which one of the shareholders shall receive the loan, whenever there are a number of stockholders who may simultaneously desire to effect a loan. * * Said corporation may determine by an express provision of by-laws that when each share of stock reaches a certain value, to be specified thereby, not exceeding two hundred dollars, the stockholders shall be paid such value for each share they respectively own, and that upon

such payment the stock shall revert to the corporation." Said act also provides that the members of said corporation shall have the power to adopt a constitution, and the constitution adopted, the by-laws and regulations shall have the force and effect of legal enactments on the members of said corporation. That the by-laws may prescribe the amount of shares and the time of payment thereof by instalments, but the monthly call for payment of said instalment shall not exceed two dollars on each and every share. Every share of stock shall be liable for and subject to a lien for the satisfaction of unpaid instalments, and the by-laws may prescribe the mode, etc., of enforcing said lien. Also that no one person shall hold more than fifty shares.

The charter defines the object and purpose of said Association to be "to raise funds to be used by the members thereof only for the purpose of building houses and securing homesteads for themselves in said (Shelby) county."

By the constitution adopted by the respondent corporation it is provided, among other things, " that the stock of this Association may be issued in successive series of *two hundred dollars* per share, the number of shares in each new series to be determined by the board of directors." "On each share of stock there shall be paid an instalment of one dollar per month in advance, and any person wishing to subscribe for stock subsequent to the issue of a series shall pay up all instalments which may have become due in the series in which said stock may be taken or issued,

and such premiums as the board of directors may require." "In case of non-payment of instalments or interest by borrowing members for the period of six months, it shall be the duty of the board of directors to enforce the terms of the deeds of trust held as security in accordance with the provisions of the act of the Legislature," etc., above cited." "At the stated monthly meetings of the directors the fund on hand not otherwise appropriated, if the amount of two hundred dollars or more, shall be offered for loan. Every member shall be entitled to a loan not exceeding the par value of any number of shares held by him or her; *provided, however,* that no member shall be entitled to a loan on more than fifteen shares at one bidding. Choice of priority of loan shall be by bid of premium, and the member bidding the highest premium for priority or privilege shall have the first choice of loan, and the remaining funds, if any, shall be loaned in like manner. Interest on loans shall be at the legal rate of interest from the time of making said loans, and shall be paid in monthly instalments in advance, and at the same time the regular dues are paid; and such loans shall be for the purpose of enabling the borrower thereof to secure a home, or for the purchase of other real estate, or for the improvement of the same, and for no other purpose whatever, and the loan shall be secured by deed of trust on unencumbered real estate. * * Should it be ascertained that members having taken a loan are using it for any purpose not contemplated in this constitution, it shall be *discretionary* with the directors

as to further loans to said members. Whenever the stock of the oldest series shall reach its ultimate or par value, and all losses and gains adjusted thereto, there shall be paid to each member holding unpledged shares the sum of two hundred dollars per share; and all securities held in trust on stock pledged for loans shall be quit-claimed and satisfied, and said shares revert to the Association; *provided,* that all claims of whatever kind against the stock or securities of any member must be fully paid up before said stock shall be redeemed or securities canceled."

Mrs. Julia S. Chester, the ancestor of complainant, became a member of the defendant corporation and the owner of eight shares of the sixth series of the stock prior to the 5th of February, 1878, when the money on hand was offered for loan by the said Association, among its members, at a regular meeting, to determine which of them should have the preference to borrow the sum of $1,200 then on hand, and there were a number of members present who desired simultaneously to borrow the same. Said Julia S. Chester bid for such preference or priority the sum of $66 premium on each one of six of the said eight shares so held by her, aggregating $396 for such preference, and her's being the highest bid, the same was struck off and sold to her at said sum of $396 premium. Said premium was not then paid, but she, having filed her application for said loan of the $1,200, to pay off taxes, incumbrances, etc., such loan was, in pursuance of said bid and application, made to her, and said premium of $396, bid by her for such preference, was then

paid by deducting it from the $1,200, and she was paid the sum of $804 at the same time, and no other sum was paid her thereon, and on said 5th day of February, 1878, she executed her note to said Association for $1,200, which included the $804 received by her and the $396 bid by her for the preference of said loan, said note being dated of said 5th of February, 1878, payable one day after date, as expressed on its face, and bearing interest at six per cent. from date; and to secure this note executed a deed of trust to respondent, A. Woodruff, as trustee, upon a certain house and lot in the city of Memphis. The terms and conditions of said deed of trust, as recited on its face, are as follows: "That, whereas, the said Julia S. Chester has become indebted to the Workingmen's Building and Loan Association in the sum of $1,200, as is evidenced by my promissory note, signed by her, for said sum of $1,200, and due one day after date, with interest from date at the rate of six per cent. per annum, and the said Julia S. Chester is desirous to secure and make certain the payment of the said note according to the tenor thereof, and the stipulations and conditions hereinafter set forth; now, then, if the said Julia S. Chester shall pay, or cause to be paid, the full amount of interest on said note monthly, in advance, as required by the rules, regulations and by-laws of said Association, and in addition thereto shall pay all assessments, dues and fines that may be assessed or imposed upon her by virtue of her ownership of stock as aforesaid, regularly and promptly, as required by the rules, regulations, by-laws and

constitution of said Association, until the assets of said Association shall reach the par value of all shares of stock taken and subscribed for, or until *she* ceases to be a stockholder of said Association, and shall in all other respects fully comply with the rules, regulations, by-laws and constitution of said Association, then, and in that event, this deed is to be void and of no effect; and to make sure the payment of the amount herein secured in the event of accident, she covenants to keep the premises insured to the amount of two thousand dollars, pay taxes, etc." The deed then proceeds as follows: "And if I should fail, for a period of six months, to pay the interest, assessments, monthly dues and fines hereinbefore mentioned, as well as the premiums and taxes aforesaid, pursuant to the provisions of the constitution, by-laws, rules and regulations of said Association and the stipulations and covenants herein made and set forth, the said A. Woodruff, or his successors in office, as trustee, may, after giving thirty days' notice, etc., expose said lot to public sale, to the highest bidder, for cash, and appropriate the proceeds : First, to the payment of the expenses and costs of sale; second, to the satisfaction of said debt of twelve hundred dollars, with all the interest and accumulated expenses as hereinbefore set forth, whatever they may be, and the balance, if any there be, to me or my legal representative."

On the 2d of April, 1878, the said Julia S. Chester made another transaction with said Association precisely similar in all respects to the one above stated, in which she purchased the privilege of a loan of $400

upon her two remaining shares of stock at a premium of $68 per share, aggregating $136, and received $264, executing her note for $400, also secured by deed of trust in precisely the same forms as those above stated.

Said Julia S. Chester paid on said six shares on which she made the $1,200 loan one dollar per share per month until the same amounted to $366 dues paid on said stock, and on the two shares she also paid one dollar per share per month until $122 of dues on said stock was paid. She paid on said $1,200 loan, at the rate of $6 per month interest until the sum of $354 was paid thereon, and on the $400 note she paid interest at the rate of $2 per month until the same amounted to the sum of $116, when she ceased to make further payment.

Mrs. Chester having died, the complainant, Margaret Patterson, who is her only child and heir-at-law, filed this bill, alleging that said transactions, as above stated, were usurious, and seeking to have an account of said usury, and the mortgaged premises relieved from the same, etc.

The respondent, by its answer, denies that said transactions were usurious, and files its answer as a cross-bill, by which it avers that said property is justly chargeable with said amounts of $1,200 and $400, with interest at the rate of six per cent. from the dates of said notes respectively, less the proper credits for the amounts so paid, as in said answer set forth, and seeks to enforce the same.

The chancellor held that said transactions were

usurious; that said premiums bid by said Julia S. Chester for a preference or priority in making said loans were but devices to evade the usury laws of this State, and were illegal, etc. He further held that the contract for and payment of dues by complainant's ancestor upon her capital stock were usurious and unlawful, and that all payments made thereunder should be applied as credits upon the original indebtedness, etc., and ordered an account charging complainant with the amount of moneys actually received by Mrs. Chester, and crediting her with the several sums paid into the Association, on the basis of partial payments; and holding said deeds of trust as valid securities for whatever amount might thus be found due the respondent. The respondent has appealed.

It seems to be clear that it was the purpose of the Legislature, by the provisions of the 14th section of the act above recited, to authorize such transactions as are here complained of, and the principal, if not the only, question to be determined is, had the Legislature such power? and this depends entirely upon the question whether or not these transactions were usurious.

Article XI., section 7, of the Constitution of this State provides that the Legislature shall fix the rate of interest; and the rate so established shall be equal and uniform throughout the State. And section 8 of the article provides that the Legislature shall have no power to suspend any general law for the benefit of any particular individual; nor to pass any law for the benefit of individuals inconsistent with the general

laws of the land. The Legislature, under these restrictions, has no power to authorize a corporation to charge a higher rate of interest than that fixed by the general law of the State : *McKinney et als.* v. *The Overton Hotel Co.*, 12 Heis., 104; nor to suspend the general law in . favor of a corporation: *Daley* v. *The State*, 13 Lea, 228. No device can be used to protect a transaction by which more than the lawful rate of interest is secured for the loan of money: 5 Hum., 510; 2 Cold., 418; 3 Cold., 31; 1 Heis., 495; 4 Lea, 160.

A transaction identical in its methods with those now under consideration, came before this court in the case of *Martin* v. . *The Nashville Building Association*, 2 Cold., 419, and was held to be a device to loan money at usurious rates, and declared illegal and void.

The only difference between that case and the one here presented is that the authority to sell the privilege of loans to the highest · bidder among the members of the Association in that case was conferred by the constitution and' by-laws of · the corporation, but was not contained in the charter; and in this it is contained in the act of the Legislature which authorizes the incorporation of the defendant, as well as in its constitution. And it has been virtually conceded in · argument that if that case is to stand as authority this must be decided in favor of the complainant. But, it is very earnestly insisted, that case was not well decided and should be overruled; and we have been referred to a great number of cases in which

transactions very similar to those involved in this case have been sustained by the courts.

A collection of these cases has been compiled and printed in the form of a brief, constituting a book of over two hundred pages, and furnished us. We have examined them, as well as various other cases and authorities, to which we have been referred, with as much care as we have been able. It does appear that such transactions, or transactions apparently similar in most respects, and including this feature of bidding a bonus or premium for the privilege of the loan of money, in addition to paying the lawful rate of interest, have been uniformly upheld in England and in a majority of the United States. Some of these cases have involved transactions of voluntary associations, and others of incorporated companies, and have been sustained upon the idea or assumption that they were partnership transactions, and as dealings between the partners with the partnership funds. The English cases, notably, as well as some of the earlier American cases, seem to have proceeded upon this idea. Others have been based upon the assumption that the transaction was a sale by the member and stockholder of his shares of stock to the company (the actual value of which was uncertain) for the present advance of a sum of money less than their nominal or prospective value; while others have been placed upon the authority of legislative enactments, without regard to the question as to whether they may or may not, without such sanction, have been usurious. All these cases except, perhaps, the class last men-

tioned, have repudiated the idea of an advance or premium for the loan of money.  In other States the courts have held such transactions usurious, and declared them void.  The principal cases, both English and American, have been cited and commented upon by Mr. Endlich in his work on Building Associations, sections 338 to 357 inclusive.

The transactions involved in this case cannot be considered in the light of partnership transactions, for the simple reason that stockholders in a corporation are not partners, nor is the stock of a corporation partnership property.  It does not appear in the cases that have been sustained, upon the authority of legislative enactments, that the State Constitutions under which they were decided contained any such restrictions as those contained in our Constitution of 1870, which we have cited above.  Nor do we think the transactions in question can be legitimately treated as a sale of her shares of stock by Mrs. Chester to the corporation.  The language of the statute, as well as of the constitution of the Association, which we have quoted, evidently contemplated the transactions which they undertook to authorize as loans, and so designated them.  The transaction itself is, that Mrs. Chester, being desirous to procure a loan of the aggregate sum of these notes of, say $1,600, gave the Association $532 for the privilege of borrowing that sum, and which was deducted from it, leaving the actual amount received by her in both transactions $1,068, and for which she executed her promissory notes for $1,600, payable one day after date with in-

terest at six per cent. from date, payable monthly in advance, and which she secured by deed of trust, by the conditions of which she was bound to pay said interest monthly in advance, and also pay all assessments, dues and fines which might be imposed 'upon her by virtue of her ownership of the stock as aforesaid regularly and promptly, etc., until the assets of said Association should reach the par value of all shares of stock taken and subscribed for, etc. Or, in other words, until the accumulation of her stock in said company should amount to $200 on each share, or $1,600, the amount of the face of said notes, then it was to be so applied, the deed of trust canceled, and the stock revert to the company. But if she failed for six months to pay said interest, assessments, dues, etc., then said deed of trust was to be foreclosed by a sale of the property, and said notes, with all interest due thereon, paid out of the proceeds. While this transaction has none of the elements of a sale of stock, it has all those of a loan of money, and which was the only consideration for the premium given and deducted from the amount nominally borrowed. We do not understand, however, that it is seriously controverted by the defendant that this transaction was in fact a loan of money. And it is also frankly admitted by the able counsel of the defendant, that if an individual were to sell the *privilege* of the loan of a sum of money for, say thirty per cent., and take a note for the amount so loaned, bearing interest from date, the transaction would be usurious. But it is insisted that these transactions involve a

co-operative principle among the stockholders of the Association, and the length of time during which interest and monthly dues, etc., would have to be paid by the borrower from the date of the loan until the value of the stock reaches par, is unknown and uncertain, depending upon the amount of premium, etc., paid by other members upon like transactions, and hence it might result that the borrower would in fact have to pay a less amount than six per cent. upon the loan, including the premium paid for it, and consequently, as it was uncertain and incapable of ascertainment at the time of the transaction whether this would be so or not, it could not be usurious.

The vice of this argument, we think, is, that if it is perfectly apparent, as it must be, that the transaction considered by itself is usurious, it cannot be rendered lawful by the fact that the complainant, as a stockholder in the same corporation, may in the meantime derive a benefit from other transactions equally usurious, that will compensate her for the amount of usury which she has paid upon her individual transactions with the Association. The legality or illegality of a usurious transaction cannot be made to depend upon the success of the party who pays the usury in other transactions, whether they be usurious or not.

Mrs. Chester received $1,068, for which she executed her note for $1,600. The substance of the transaction was that she was to pay not only six per cent. interest upon this note, monthly in advance, but the principal was also to be paid by her, and with means to which she would otherwise have been en-

titled. Such a transaction does involve the payment of more than six per cent. per annum for the use of money.

If a stockholder in a bank were to make a negotiation with it, by which he agrees to receive $1,000 in cash, and execute, his note for $1,600, bearing six per cent. interest from its date, and to pay the interest monthly in advance until the dividends to be declared upon his stock should amount to a sum sufficient to pay the principal of the note, and that in the meantime said dividends, as they were declared, should remain in the bank to be loaned by it for its own benefit, no one, it seems to me, would contend that such a transaction would not be usurious, although the bank might, by other and greater usurious transactions with other customers, by its gains swell his dividends until such a borrower might, in fact, have to pay less interest than six per cent. upon the amount actually borrowed, nor would the transaction be relieved of its usurious character by an arrangement that stockholders of the bank should be entitled to the privilege of. It is difficult to distinguish such a transaction in principle from those now under consideration. If it were not designed to authorize these Associations to receive more than legal interest for the use of money under the guise of selling the privilege of the loan of it, it would seem that some other mode of determining the right of priority among the members desiring to borrow, free from suspicion of illegality, had not suggested itself. And it cannot matter that the Legislature expressly enacted that this so-called pre-

mium should not be received as part of the loan or as interest, but merely as a mode of determining which one of the applicants should receive it. Every loan of money must necessarily include the *privilege* of making it, and the attempt here made to resolve the transaction into two separate and distinct elements or purchasable chattels involves a nicety of discrimination which I cannot quite comprehend, and is evidently too subtle for the ordinary transactions of life.

It is said, however, that these Building Associations are benevolent in their design, and the chief object of their formation is to aid the heads of families of small means to purchase or build their own homes. Such objects are eminently worthy of all the aid and encouragement that can lawfully be bestowed upon them. They have sometimes, however, been assailed from a different standpoint. Mr. Justice Lumpkin, in the case of the *Bibb County Loan Association* v. *Richards*, 21 Ga., 592, has epitomized what is generally said for and against them as follows: "Their friends and advocates who claim for them an antiquity older than the Christian era, insist that they are peculiarly propitious to the poor, by stimulating them to save small sums from the grog-shop and the gambling house, and to purchase with their hoards and earnings happy homes for themselves and families; and that the terms upon which they procure help for this purpose are such as they could get no where else, and not so hard as those exacted by monied men, who will not give long indulgence to any, especially those in straightened circumstances; that another object which they subserve is to

supply a place of safe deposit for the savings of the stockholders, in which they are entitled to receive lawful interest, which is not allowed by banking and other corporations."

"On the other hand it is asked, why so much complication and mystery about a system designed for the benefit of the masses, especially the poor and humble? That it is all for the purpose of concealing the repulsive interest they charge; that nothing can be understood of its workings, except that it produces the most gratifying gains to the capitalist who invests his money in it to accumulate; that the borrowers, once in the web, may, like the little fly, struggle in vain to escape the entanglement; that the roof that he hoped would have sheltered him crumbles beneath the mortgage that overspreads it; that the sooner these institutions are abolised the better."

But granting for them all the benefits which are claimed in their behalf, we are compelled to administer the law, under the Constitution, as we find it, not as we might wish it to be; and transactions which are usurious, and therefore illegal, cannot be consecrated by beneficent results, or rendered lawful by advantages, real or imaginary, which may flow from them; and which, if conceded, can only prove that, although generally disastrous, it may, under some circumstances, prove beneficial to people to be enabled to borrow money upon long credits, even at usurious rates of interest, and might furnish perhaps an argument more or less persuasive in favor of the establishment of a conventional rate of interest in accordance

with the provisions of the Constitution which permits that to be done. I am, therefore, of opinion that these transactions are usurious, and that the provisions of the act of the Legislature above cited, which undertakes to authorize them, if that is the proper construction to be given to it, is in contravention of sections 7 and 8 of Article XI. of the Constitution above quoted, and therefore void.

The chancellor's decree should, therefore, be affirmed with costs.